1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  THE VALLEJO POLICE OFFICERS                  No.  2:21-cv-00454-DAD-CKD
    ASSOCIATION, et al.,
12
                Plaintiffs,
13                                                ORDER GRANTING DEFENDANTS'
         v.                                       MOTION TO DISMISS PLAINTIFFS'
14                                                SECOND AMENDED COMPLAINT
    CITY OF VALLEJO, et al.,
15                                                (Doc. No. 18)
                Defendants.
16

17

18          This matter is before the court on the motion to dismiss plaintiffs' second amended

19   complaint filed by defendants pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 25,

20   2021.  (Doc. No. 18.)  On August 5, 2021, the court vacated the hearing on the pending motion in

21   light of the referral of this case to the court's Voluntary Dispute Resolution Program, and on

22   September 14, 2022, the parties notified the court that they were unable to settle this case.  (Doc.

23   Nos. 25, 34.)[1]  For the reasons explained below, the court will now grant defendants' motion to

24   dismiss with leave to amend, in part.

25   /////

26   _____

27   [1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 29.)  The
     undersigned has endeavored to work through a backlog of inherited submitted motions in civil
     cases as quickly as possible since returning to the Sacramento courthouse a little over one year
28   ago.

                                                  1

# BACKGROUND

This case arises from the discipline imposed upon and subsequent termination from the Vallejo Police Department ("VDP") of plaintiff Lieutenant Michael Nichelini, who also serves as the president of the City of Vallejo's police union—plaintiff Vallejo Police Officers' Association ("VPOA"). This lawsuit was filed by plaintiff Nichelini on behalf of himself and by plaintiff VPOA on behalf of itself and its members. In their operative second amended complaint ("SAC"), plaintiffs allege as follows.

## A.    The Parties

Plaintiff VPOA is the exclusively recognized collective bargaining agent for VPD officers of all ranks, except the chief of police and the newly-created position, deputy chief of police. (Doc. No. 17 at ¶ 14.) The VPOA's primary purpose includes representing its members in their relations with the City of Vallejo and advocating for their interests. (*Id.*) Plaintiff VPOA asserts its claims in this action on behalf of itself and its members. (*Id.*)

Plaintiff Michael Nichelini is a former law enforcement officer with the VPD who was terminated from his position in March 2021. (*Id.* at ¶¶ 10, 34.) Before his termination, he had served fourteen years with the VPD. (*Id.* at ¶ 34.) He became the VPOA president on January 1, 2020. (*Id.* at ¶ 44.) Plaintiff Nichelini asserts his claims in his individual capacity as well as in his official capacity as president of the VPOA. (*Id.* at ¶ 13.)

Plaintiffs named as defendants in this action the City of Vallejo (the "City") and the VPD (collectively, the "municipal defendants"). (*Id.* at ¶ 15.) In addition, plaintiffs named the following individual defendants in both their individual and official capacities: police chief Shawny Williams; city manager Greg Nyhoff; assistant city manager Anne Cardwell; former mayor Bob Sampayan; and current and former city councilmembers Hermie Sunga, Cristina Arriola, Hakeem Brown, Pippin Dew, Mina Diaz, Robert McConnell, Katy Miessner, and Rozzana Verder-Aliga (collectively, the "individual defendants"). (*Id.* at 4–6.) According to the SAC, all defendants were policymakers for the VPD and the City. (*Id.* at ¶ 35.) Furthermore, the SAC alleges that defendants Williams, Nyhoff, Cardwell, Sampayan, Sunga, Arriola, Brown,

/////

2

1   Dew, Diaz, McConnell, Miessner, and Verder-Aliga were final decision makers for the VPD, the

2   City, or both.  (*Id.* at ¶¶ 16–27.)

3   **B.      Factual Background**

4           The City and the VPD have been immersed in public controversy for over a decade due to

5   the VPD's conduct and the City's endorsement of that conduct.  (Doc. No. 17 at ¶¶ 3, 36.)  The

6   tensions within the City boiled over in 2019 after the contentious fatal shooting of Willie McCoy,

7   an African-American resident of Vallejo, by VPD officers.  (*Id.* at ¶¶ 2, 37.)  This incident led to

8   the election of plaintiff Nichelini as the new VPOA president and to the replacement of the police

9   chief.  (*Id.* at ¶ 3.)  In September 2019, defendant Williams was appointed chief of police for the

10  City, stepping into this role during a time of heightened tensions between the City's citizens and

11  defendants.  (*Id.* at ¶ 38.)

12          Before and after changes to the city council in the 2020 election, defendants embraced a

13  policy aimed at shielding defendant Williams from legal scrutiny, portraying his actions as

14  representative of them rather than him.  (*Id.* at ¶ 39.)  Additionally, defendants undertook efforts

15  to "reform" the VPD by assigning blame for mismanagement to rank-and-file VPOA members,

16  including plaintiff Nichelini, in an attempt to avoid accountability.  (*Id.* at ¶ 40.)  Additionally,

17  defendants targeted former VPOA president Mat Mustard and then-current VPOA president

18  plaintiff Nichelini with unfounded allegations to weaken the VPOA's leadership.  (*Id.* at ¶ 41.)

19  This "targeting" included at least five instances of alleged harassment between January and

20  December 2020, each intended to interfere with the VPOA's concerted rights.  (*Id.* at ¶ 4.)  The

21  plan was orchestrated to pave the way for defendant Williams's preferred candidates to assume

22  positions on the board of the VPOA.  (*Id.* at ¶ 41.)

23          A scheme was devised to remove plaintiff Nichelini from VPOA leadership by falsely

24  branding him as a racist.  (*Id.* at ¶ 42.)  On March 4, 2020, plaintiff Nichelini, in his capacity as

25  VPOA president, sent an email to fellow VPOA members discussing interactions with the public

26  and the ongoing political dynamics between VPOA members and defendants, discussions which

27  plaintiffs allege constitute matters of public concern.  (*Id.* at ¶ 45.)  Plaintiff Nichelini sent the

28  email from his personal computer, using a software application he wanted to encourage VPOA

3

1    members to use for communication amongst themselves.  (*Id.* at ¶ 46.)  The email contained a

2    small image of one of VPD's earliest historic badges.  (*Id.* at ¶ 45.)  Unbeknownst to plaintiff

3    Nichelini, the image of the badge bore a small engraving of a Gammadion cross (i.e., a swastika),

4    which, when added to the badge around 1907, held no negative connotations.  (*Id.* at ¶ 46.)

5    Despite plaintiff Nichelini's explanations, defendants Williams and Nyhoff later publicized the

6    matter, falsely accusing plaintiff Nichelini of a hate crime.  (*Id.* at ¶ 47.)[2]

7          On July 15, 2020, defendant Williams placed plaintiff Nichelini on administrative leave

8    and prohibited him from being in the VPD workplace based on defendant Williams's accusations

9    that plaintiff Nichelini destroyed a windshield that was a crucial piece of evidence in a prominent

10   officer-involved shooting incident that had occurred on June 2, 2020.  (*Id.* at ¶ 50.)  Subsequently,

11   defendants leaked false information about plaintiff Nichelini's alleged role in destroying the

12   windshield to the press.  (*Id.* at ¶ 51.)  Defendants also made public the March 4, 2020 badge

13   email with the intention of further tarnishing plaintiff Nichelini's reputation.  (*Id.*)[3]

14         Plaintiffs allege that the disciplinary action taken against plaintiff Nichelini in July 2020

15   was a response to plaintiff Nichelini's filing of grievances on behalf of the union.  (*Id.*)

16   Specifically, plaintiff Nichelini filed a grievance (with an unspecified entity) in May 2020 on

17   behalf of the union against the VPD regarding defendants' efforts to civilianize the public

18   information officer and officer recruitment positions.  (*Id.* at ¶ 48.)  In addition, in June 2020, he

19   filed a complaint with the California Public Employment Relations Board ("PERB") on behalf of

20   the VPOA against the VPD regarding defendants' efforts to civilianize these positions.  (*Id.*)

21   Plaintiffs allege, "[a]mong other things, the timing of the false accusations against [plaintiff]

22   Nichelini by [defendant] Williams evinces retaliatory intent."  (*Id.* at ¶ 51.)

23         On July 31, 2020, plaintiff Nichelini filed another complaint with the PERB against the

24   VPD on behalf of the VPOA, asserting that defendants were interfering with the VPOA's

25   _____

26   [2]  In their SAC, plaintiffs have not alleged any facts detailing how, when, or to whom the matter
     was purportedly publicized.

27

28   [3]  Again, in their SAC, plaintiffs do not allege facts specifying when or where the badge email
     was made public nor what form the publication purportedly took.

                                            4

1   protected activities through retaliation against him.  (*Id.* at ¶ 52.)

2          On August 21, 2020, defendants responded to the VPOA's grievance regarding the public

3   information officer and recruiting positions, denying the grievance at Step Two.  (*Id.* at ¶ 54.)  On

4   August 25, 2020, plaintiff Nichelini filed a Step Three grievance on behalf of the VPOA against

5   defendants regarding the public information officer and recruiting positions.  (*Id.*)

6          A few days later, on August 28, 2020, plaintiff Nichelini received two notices of

7   interviews.  (*Id.*  at ¶ 55.)[4]  The first notice was in relation to a city council meeting from nearly a

8   year prior, and the notice alleged dishonesty in a previous internal affairs investigation.  (*Id.*)[5]

9   The second notice was given to plaintiff Nichelini from the VPD and regarded disparaging

10  comments he had allegedly made to a human resources officer about defendant Williams.  (*Id.*)

11  Plaintiffs allege that the timing of these disciplinary notices evince retaliatory intent (*id.*),

12  presumably for plaintiff Nichelini's action of filing a Step Three grievance, though plaintiffs do

13  not allege specific facts in this regard in the SAC.

14         On September 3, 2020, defendants subjected plaintiff Nichelini to an administrative

15  interrogation regarding the windshield evidence, the 1907 badge image, and a press release

16  plaintiff Nichelini had sent while performing his duties for the VPD.  (*Id.* at ¶ 56.)[6]  On

17  September 4, 2020, plaintiff Nichelini filed a grievance (with an unspecified entity) on behalf of

18  himself and the VPOA against defendants, citing discrimination against VPOA members for

19  engaging in protected, concerted activities.  (*Id.* at ¶ 57.)  On September 23, 2020, plaintiff

20  Nichelini received a notice of intent to discipline him for a September 24, 2019 incident at a city

21  council meeting (*id.* at ¶ 58)—presumably the same incident for which plaintiff Nichelini

22  _____

23  [4]  From the allegations of the SAC, it is unclear whether plaintiff Nichelini was actually
    interviewed after receiving these interview notices.

24  [5]  In their SAC, plaintiffs do not specify from whom plaintiff Nichelini received the first notice.
25  Additionally, although the allegations are not entirely clear about who was dishonest and who
    would be interviewed, the reasonable inference that can be drawn is that the notice of interview
26  was intended to inform plaintiff Nichelini that he would be interviewed concerning allegations
    that he had been dishonest in a previous investigation.

27  [6]  The SAC lacks any details about the press release, including its content, location of issuance,
28  distribution, and the date it was sent.

1    received the interview notice on August 28, 2020, though again, plaintiffs do not specify in their

2    SAC.  During this 2019 city council meeting, plaintiff Nichelini, who was responsible for

3    security, used his cell phone to record portions of the meeting he was concerned would not be

4    captured by his body-worn camera.  (*Id.*)  Again, plaintiffs allege that the timing of this

5    disciplinary notice is indicative of a retaliatory intent (*id.*), presumably for the filing of

6    grievances, though plaintiffs do not specifically allege that connection in their SAC.[7]

7         In October 2020, the VPOA filed several lawsuits alleging that the City had misused an

8    emergency declaration to infringe upon the rights of VPOA members.  (*Id.* at ¶¶ 60, 61.)

9         On December 7, 2020, plaintiff Nichelini, acting in his capacity as VPOA president,

10   responded to an email from a local newspaper reporter who was relocating to Georgia.  (*Id.* at

11   ¶ 62.)  In that email, plaintiff Nichelini expressed concerns regarding the fairness of that

12   reporter's reporting on VPOA members and the VPD.  (*Id.*)  On December 15, 2020, defendant

13   Williams instructed the VPD deputy chief, Michael Kihmm, to notify plaintiff Nichelini that he

14   was under an internal affairs investigation regarding his December 7, 2020 email.  (*Id.* at ¶¶ 5,

15   62.)  The notice cautioned plaintiff Nichelini that the investigation could potentially result in

16   disciplinary action and falsely accused him of "sending an inappropriate and potentially

17   threatening email to a member of the media."  (*Id.* at ¶ 6.)  Plaintiffs allege that the timing of this

18   notice also evinces retaliatory intent (*id.* at ¶ 62), presumably for plaintiffs having filed lawsuits

19   in October 2020, though again, plaintiffs do not specifically allege the cause of the asserted

20   retaliation in their SAC.

21        On December 18, 2020, plaintiff Nichelini was subjected to an interrogation regarding his

22   December 7, 2020 email to the reporter.  (*Id.* at ¶¶ 7, 63.)  Following this interrogation, the City

23   and the VPD issued a personnel report that, according to plaintiff, contained inconsistencies,

24   demonstrably false information about plaintiff, and conclusions divorced from the supporting

25   evidence.  (*Id.* at ¶ 8.)  On December 21, 2020, plaintiff Nichelini received notice that the City

26

27   ────────────────
     [7]  Plaintiffs allege that, on an unspecified date, defendant Williams informed local civil rights
     attorney Melissa Nold, a citizen who complained to defendants about plaintiff Nichelini, that
28   plaintiff Nichelini had been disciplined.  (Doc. No. 17 at ¶ 59.)

1   intended to terminate his employment with the VPD.  (*Id.* at ¶ 64.)

2         On March 31, 2021, defendants, through defendant Williams, delivered a notice of 40

3   hours of unpaid suspension to plaintiff Nichelini as discipline for the September 24, 2019 city

4   council meeting incident.  (*Id.* at ¶ 69.)  Further, the March 31, 2021 notice informed plaintiff

5   Nichelini that he had been terminated from his position at the VPD.  (*Id.*)  The notice attempted to

6   paint plaintiff Nichelini as being a "racist cop."  (*Id.* at ¶ 70.)  This allegation, according to

7   plaintiffs, was baseless and damaging, aiming to permanently tarnish plaintiff Nichelini's career,

8   professional reputation, and personal life.  (*Id.*)

9         Based on the foregoing allegations in their SAC, plaintiffs collectively assert the

10   following six federal claims brought pursuant to 42 U.S.C. § 1983 against all defendants:  (1) a

11   First Amendment free speech claim; (2) a First Amendment right to free association claim; (3) a

12   Fourteenth Amendment substantive due process claim; (4) a Fourteenth Amendment procedural

13   due process claim; (5) a Fourteenth Amendment equal protection claim; and (6) a First and

14   Fourteenth Amendment retaliation claim.  (Doc. No. 17.)  In addition, plaintiff Nichelini asserts a

15   § 1983 claim against all defendants for violating his federal right to privacy.  (*Id.*)  Furthermore,

16   the SAC includes thirteen state law claims.  (*Id.*)

17   **C.**   **Procedural History**

18         On June 16, 2021, plaintiffs filed the SAC.  (Doc. No. 17.)  On June 25, 2021, defendants

19   filed the pending motion to dismiss the SAC due to plaintiffs' failure to state any cognizable

20   claims against them.  (Doc. No. 18.)  On July 23, 2021, plaintiffs filed their opposition to the

21   pending motion to dismiss, and on July 30, 2021, defendants filed their reply thereto.  (Doc. Nos.

22   20, 24.)

23                  **LEGAL STANDARD**

24         The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

25   sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

26   1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

27   sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

28   F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## ANALYSIS

### A.    Plaintiffs' § 1983 Claims Against the Municipal Defendants

Defendants seek the dismissal of plaintiffs' § 1983 claims brought against the municipal defendants based on alleged municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  (Doc. No. 18 at 15.)

It is well-established that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691; *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  To state a *Monell* claim against a municipality, plaintiff must allege facts demonstrating "that an 'official policy, custom, or pattern' on the part of [the municipality] was 'the actionable cause of the claimed injury.'"  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143

(9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (explaining that to establish municipal liability under § 1983, a plaintiff must show a direct causal link between the municipal policy or custom and the alleged constitutional violation).  To sufficiently allege *Monell* liability under this approach, "a plaintiff must 'specify the content of the policies, customs, or practices the execution of which gave rise to his or her Constitutional injuries.'" *Est. of Kong ex rel. Kong v. City of San Diego*, No. 22-cv-01858-BAS-DDL, 2023 WL 4939370, at *5 (S.D. Cal. Aug. 2, 2023) (citations and brackets omitted).  In other words, a plaintiff "must identify a specific policy or custom and then articulate . . . the basis for concluding how the identified policy or custom represents 'official policy.'" *Id.* (citation and brackets omitted).

In this case, plaintiffs' § 1983 *Monell* claims appear to be predicated on an alleged "official policy" that caused their injury.  (Doc. No. 17 at ¶¶ 39–43, 81, 112.)  As another district court has explained:

> "Official" policies for which a government entity may be "actually responsible" include  (1)  a formal "policy statement,  ordinance, regulation, or decision officially adopted and promulgated by [the government entity's lawmaking body]"; (2) the acts of one of the entity's officials who has "final policymaking authority" with respect to the particular area or issue involved,  and (3) practices or customs that, while not formally adopted or expressed by the entity itself, are "so persistent and widespread as to practically have the force of law[.]"  To be deemed an "official policy," a practice must be so "permanent" and "well settled" that it has effectively become "the standard operating procedure of the local government entity."

*Younger v. Cnty. of San Bernardino*, No. 15-cv-01964-SVW-JC, 2018 WL 3219654, at *6 (C.D. Cal. Jan. 30, 2018), *report and recommendation adopted*, 15-cv-01964-SVW-JC, 2018 WL 3238593 (C.D. Cal. June 27, 2018), *aff'd sub nom. Younger v. Wielenga*, 772 F. App'x 521 (9th Cir. 2019) (internal citations omitted).

In their SAC, plaintiffs appear to ground their *Monell* claims in the first two categories— namely, a formal policy and the authority of a final policymaker—which the court will examine separately below.

/////

/////

1          1.          Formal Policy

2          A *Monell* claim grounded in a formal policy, rather than one based on a practice or

3   custom, involves two key distinctions.  *Est. of* Kong, 2023 WL 4939370, at *5.  First, formal

4   policies are often committed to writing and include, for example, ordinances, regulations, statutes,

5   and policy statements.  *Id.*  Second, a single constitutional violation carried out in accordance

6   with a formal policy may be adequate to establish municipal lability under § 1983; there is no

7   need to attribute a history or pattern of similar constitutional violations to the pertinent formal

8   policy to pursue a *Monell* claim.  *Id.*

9          Here, plaintiffs make several allegations in their SAC regarding purported official

10  policies.  For instance, they allege that all defendants, including the municipal defendants,

11  formulated an official policy and plan to shield defendant Williams from public scrutiny by

12  endorsing defendant Williams's actions, such as disciplining plaintiff Nichelini and other VPOA

13  members.  (Doc. No. 17 at ¶ 39).  Plaintiffs also allege that defendants orchestrated an official

14  policy and plan to reshape the VPD and its officers, including VPOA members, by making the

15  public believe a false narrative that problems within the department were caused by the VPOA

16  and plaintiff Nichelini.  (*Id.* at ¶ 40.)  They allege that defendants created an official policy and

17  plan to dismantle the leadership of the VPOA to facilitate defendant Williams's installation of his

18  own preferred candidates as members of the VPOA board, including by levelling false allegations

19  against former VPOA president Mustard and then-current VPOA president plaintiff Nichelini.

20  (*Id.* at ¶ 41.)  Furthermore, plaintiffs allege that defendants crafted an official policy and strategy

21  to unjustly depict VPOA members, particularly plaintiff Nichelini, as racists in order to dismantle

22  the current leadership of the VPOA.  (*Id.* at ¶ 42.)

23         The court finds these allegations to be speculative and conclusory because plaintiffs allege

24  no facts to support their conclusion that the municipal defendants maintained these official

25  policies, nor facts regarding whether, how, and when these purported policies were promulgated

26  or adopted by the municipal defendants.  Plaintiffs fail to point to a written formal policy, such as

27  an ordinance, regulation, or policy statement.  *See Est. of Kong*, 2023 WL 4939370, at *6 (finding

28  that the plaintiff failed to allege a formal governmental policy where she merely offered "a

10

formulaic recitation of the second *Monell* element—that Municipal Defendants have an official policy—in lieu of any apposite formal policy").  Without more specific factual allegations, plaintiffs' claims for relief against the municipal defendants based on an official policy do not rise above the speculative level and, thus, do not state a cognizable claim for relief.  *See Twombly*, 550 U.S. at 555 (stating that to survive a motion to dismiss, a plaintiff must plead "[f]actual allegations [that are] enough to raise a right to relief above the speculative level"); *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1061 (9th Cir. 2019) ("[E]ven if Plaintiffs had pleaded a plausible Fourth Amendment claim, the FAC ascribes Defendants' alleged misconduct to official policy in a conclusory fashion that is insufficient to state a viable claim."); *Canas v. City of Sunnyvale*, No. 08-cv-05771-JF-PSG, 2011 WL 1743910, at *6 (N.D. Cal. Jan. 19, 2011) (granting the city defendant's motion to dismiss a *Monell* claim where the plaintiffs alleged "no facts supporting their conclusion that the City maintains an official policy of subjecting people to the unreasonable use of force or failing to train employees adequately in the use of deadly force"); *Olivera v. Vizzusi*, No. 2:10-cv-01747-WBS, 2011 WL 1253887, at *10 (E.D. Cal. Mar. 31, 2011) ("Since *Iqbal*, such conclusory allegations that merely allege the existence of a policy without providing factual content from which one could plausibly infer that such a policy exists have been repeatedly rejected.").

>          2.     Final Policymaking Authority

In the second category—final policy making authority—a municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  "[W]hether a particular official has 'final policymaking authority' is a question of state law."  *Id.* at 138; *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) ("To determine whether a school district employee is a final policymaker, we look first to state law.").  The fact that a particular official has discretion to make final decisions for a municipality under state law does not, without more, give rise to municipal liability.  *Ulrich v. City and Cnty. of San Francisco,* 308 F.3d 968, 985 (9th Cir. 2002); *Hansen v. City of San Francisco*, No. 12-cv-04210-JST, 2014 WL 1310282, at *7 (N.D. Cal. Mar. 31, 2014) ("The fact that a city employee has independent decision-making power does not

1    render him a final policymaker for purposes of municipal liability.").  Rather, "[t]he official must

2    also be responsible for establishing final government policy respecting such activity before the

3    municipality can be held liable."  *Ulrich*, 308 F.3d at 985 (quoting *Pembaur v. City of Cincinnati*,

4    475 U.S. 469, 482–83 (1986)).

5         In their SAC, plaintiffs allege that virtually every named defendant was a policymaker,

6    and they summarily allege that defendants Williams, Nyhoff, Cardwell, Sampayan, Sunga,

7    Arriola, Brown, Dew, Diaz, McConnell, Miessner, and Verder-Aliga (i.e., the police chief and

8    city officials) were final decision makers for the VPD, the City, or both.  However, "simply

9    listing a number of high-ranking individuals is not sufficient to allege a specific final

10   policymaker."  *Thurston v. City of Vallejo*, No. 2:19-cv-01902-KJM-CKD, 2021 WL 1839717, at

11   *6 (E.D. Cal. May 7, 2021) (holding that the plaintiff's allegation that a defendant was the "final

12   decision maker for the police department as he can make final decisions about discipline, training,

13   supervision and development of constitutional policing," as well as the plaintiff's allegations that

14   other defendants were final policymakers, were too conclusory); *Pazmino v. City of Vacaville*,

15   No. 2:22-cv-00273-JAM-DB, 2023 WL 2976302, at *3 (E.D. Cal. Apr. 17, 2023) ("Plaintiff's

16   SAC summarily identifies Schmurtzler as a final policymaker—a legal conclusion *Twombly* and

17   *Iqbal* prohibit.").

18        Moreover, in their allegations, plaintiffs have not clarified which of the individual

19   defendants, if any, were final policymakers as a matter of state law.  *See Pazmino*, 2023 WL

20   2976302, at *3 ("The success of Plaintiff's ratification claim . . . requires him to pinpoint a

21   California legal authority recognizing Schmurtzler as the final policymaker regarding the [police

22   department's] chokehold policies.  Plaintiff, however, has not done so."); *Thurston*, 2021 WL

23   1839717, at *6 ("In the allegations against both Chief Bidou and City Manager Nyhoff, Thurston

24   has not clarified which individual, if either, is a final policymaker as a matter of state law.");

25   *Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *7–*8 (E.D. Cal. Oct. 13,

26   2020) (holding that the plaintiff had not sufficiently pleaded a final policymaker for *Monell*

27   purposes where he had not alleged who, as a matter of state law, was a final policymaking

28   authority).

1    Because the SAC lacks any factual allegations supporting a plausible *Monell* claim based

2    on an alleged official policy, the court will grant defendants' motion to dismiss plaintiffs' § 1983

3    claims against the municipal defendants with leave to amend.

4    **B.**    **Plaintiffs' § 1983 Claims Against the Individual Defendants**

5           1.    <u>Allegations of Personal Participation</u>

6    Defendants seek the dismissal of plaintiffs' federal claims brought against all of the

7    individual defendants, arguing that the SAC lacks specific allegations of the personal involvement

8    of those individual defendants in any of the alleged incidents of constitutional violations that

9    underlie plaintiffs' § 1983 claims.  (Doc. No. 18 at 16.)  Defendants further argue that "[t]he only

10    defendants who are alleged to have taken any specific acts at all are the Chief [defendant

11    Williams] and the City Manager [defendant Nyhoff], but their alleged actions do not meet the

12    standard of constitutional violations."  (*Id.* at 16–17.)  The court agrees.

13    To be held liable as an individual under § 1983, the individual must have personally

14    participated in the alleged constitutional violation.  *See Jones v. Williams*, 297 F.3d 930, 934 (9th

15    Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983

16    there must be a showing of personal participation in the alleged rights deprivation[.]").  "Vague

17    and conclusory allegations of official participation in civil rights violations are not sufficient to

18    withstand a motion to dismiss."  *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th

19    Cir. 1982).

20    Plaintiffs' SAC does contain a few allegations pertaining specifically to defendant

21    Williams which vaguely allude to his role in the alleged adverse employment actions.  In this

22    regard, plaintiffs allege that "[o]n December 15, 2020, [defendant] Williams had VPD deputy

23    chief Michael Kihmm notify [plaintiff] Nichelini that he was the subject of an internal affairs

24    investigation regarding VPOA correspondence with a member of the news media" (Doc. No. 17

25    at ¶ 5) and that defendant Williams "delivered a notice of 40 hours of unpaid suspension" to

26    plaintiff Nichelini on March 31, 2021 (*id.* at ¶ 69).  However, plaintiffs do not allege that

27    defendant Williams actually participated in the decision to suspend or terminate plaintiff

28    Nichelini in March 2021.  *See Stampfli v. Susanville Sanitary Dist.*, No. 2:20-cv-01566-WBS-

DMC, 2021 WL 5867554, at *1 (E.D. Cal. Dec. 10, 2021) (granting the defendants' motion to dismiss the plaintiff's procedural due process claim where "[t]he only allegations speaking to the board defendants' role in the alleged violations are the vague allegations that they 'participated in' relevant decisions, without saying how, and conclusory statements—unsupported by factual allegations stating any action the board members took—that they either 'authorized,' 'approved,' 'acquiesced in,' or 'ratified' actions of other unspecified defendants," and noting that the plaintiff did not "allege that the board members voted to approve her termination, or even that any board member voiced approval of the decision to terminate her beforehand or afterwards"); *see also La v. San Mateo Cnty. Transit Dist.*, No. 14-cv-01768-WHO, 2014 WL 6682476, at *11 (N.D. Cal. Nov. 25, 2014) (finding that the plaintiff had not adequately alleged the personal participation of the two individual defendants in terminating her).

In addition, plaintiffs allege that "[o]n July 15, 2020, defendant Williams placed [plaintiff] Nichelini on administrative leave for allegedly destroying a windshield . . ." in retaliation for filing grievances on behalf of the VPOA.  (Doc. No. 17 at ¶¶ 50, 51.)  However, plaintiffs' only constitutional claim explicitly linked to this alleged adverse employment action is their procedural due process claim.[8]  In any event, as explained below, plaintiffs' allegation regarding defendant Williams placing plaintiff Nichelini on administrative leave in July 2020 is insufficient to support a procedural due process claim.

Furthermore, plaintiffs allege that defendants Williams and Nyhoff "publicized" plaintiff Nichelini's email that contained an image resembling a swastika and falsely accused plaintiff Nichelini of a "hate crime."  (Doc. No. 17 at ¶ 47.)  However, plaintiffs do not rely on this alleged publication as a basis for their § 1983 claims.  Other than the aforementioned allegations, there

---

[8]  It is not clear whether plaintiffs are predicating their other constitutional claims on this alleged adverse employment action.  For example, plaintiffs' First Amendment free speech and retaliation claims appear to be based on plaintiff Nichelini's "correspondence to members of the VPOA and the media about matters of public concern" (Doc. No. 17 at ¶¶ 85, 139), not the grievances plaintiff Nichelini filed.  In addition, in plaintiffs' First Amendment right to free association claim, although they allege that "[all defendants], and each of them, took multiple adverse employment actions against [plaintiff] Nichelini" (*id.* at ¶ 95), they do not explicitly link this July 2020 adverse employment action and the alleged constitutional violation.

1   are no specific allegations in the SAC regarding the individual defendants' personal participation

2   in the alleged constitutional violations.

3          With regard to the other individual defendants, plaintiffs repeatedly allege in their SAC

4   that all defendants acted collectively to injure plaintiffs without specifying the individual actions

5   or omissions of each defendant.  For example, plaintiffs allege that "[o]n December 21, 2020, [all

6   defendants] sent a notice of intent to terminate [plaintiff] Nichelini from his employment at VPD,

7   despite [all defendants] unequivocally being on notice that their conduct towards [plaintiff]

8   Nichelini and the VPOA was constitutionally and legally infirm."  (Doc. No. 17 at ¶ 64.)

9   Similarly, plaintiffs allege that "[o]n March 31, 2021, defendants, and each of them, through

10  defendant Williams, delivered a notice of 40 hours of unpaid suspension for the September 24,

11  2019 city council meeting incident."  (*Id.* at ¶ 69.)  Instead, the SAC groups the individual

12  defendants together without clearly indicating how they acted collectively, such as through a

13  formal vote of the city council to impose disciplinary actions or to terminate plaintiff Nichelini's

14  employment.  This lack of specificity renders plaintiffs' allegations clearly inadequate.  *See*

15  *Williams v. Cnty. of L.A. Dep't of Pub. Soc. Servs.*, No. 14-cv-07625-JVS-JC, 2016 WL 8730914,

16  at *5 (C.D. Cal. May 2, 2016) ("Conclusory allegations that an indistinguishable group of

17  defendants essentially engaged in identical misconduct, however, are insufficient to show that

18  plaintiff is entitled to relief from any *individual* defendant."), *report and recommendation*

19  *adopted*, No. 14-cv-07625-JVS-JC, 2016 WL 8737230 (C.D. Cal. May 20, 2016).  In addition,

20  although plaintiffs allege that "the March 31, 2021 notice informed [plaintiff] Nichelini that he

21  has been terminated from employment at the VPD for engaging in concerted activities," (Doc.

22  No. 17 at ¶ 69), that allegation is likewise insufficient because plaintiffs do not describe any

23  personal participation by any of the individual defendants in plaintiff Nichelini's termination.  *See*

24  *Stampfli v. Susanville Sanitary Dist.*, No. 2:20-cv-01566-WBS-DMC, 2021 WL 929660, at *3

25  (E.D. Cal. Mar. 11, 2021) (dismissing the plaintiff's federal claim for a violation of procedural

26  due process where the plaintiff did not "clearly allege facts that identify who was responsible for

27  her termination").

28  /////

1   Because the SAC does not contain allegations sufficiently detailing how the individual

2   defendants personally participated, if at all, in causing the alleged constitutional harms to

3   plaintiffs, plaintiffs have not sufficiently alleged any viable § 1983 claims against them.  *See*

4   *Jones*, 297 F.3d at 934; *Ivey*, 673 F.2d at 268.  Accordingly, the court will grant the defendants'

5   motion to dismiss plaintiffs' § 1983 claims brought against the individual defendants, with leave

6   to amend.

7                    2.        The Official Capacity Claims Are Redundant

8          Defendants argue that the § 1983 claims asserted against the individual defendants in their

9   official capacities should be dismissed as redundant of their claims brought against the municipal

10  defendants.  (Doc. No. 18 at 13.)  Given that plaintiffs assert these same claims against the

11  municipal defendants, the court agrees that plaintiffs' claims against the individual defendants in

12  their official capacity are redundant.  *See Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff*

13  *Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (holding that the sheriff was a "redundant defendant" in

14  a § 1983 action brought against both the county and the sheriff in his official capacity); *see also*

15  *Garcia v. L.A. Cnty. Metro. Transp. Auth.*, No. 15-cv-00149-DSF-ARG, 2015 WL 641223, at *1

16  (C.D. Cal. Feb. 13, 2015) (dismissing the plaintiff's official capacity claims brought against the

17  municipal officer as duplicative of those same claims brought against the local government

18  entity); *De-Occupy Honolulu v. City & Cnty. of Honolulu*, No. 12-cv-00668 JMS, 2013 WL

19  2284942, at *5 (D. Haw. May 21, 2013) (dismissing federal and state law claims against

20  individuals in their official capacities).

21         Accordingly, the court will dismiss plaintiffs' § 1983 claims brought against the

22  individual defendants in their official capacity, without leave to amend.

23  **C.      Additional Pleading Deficiencies in the Allegations of Constitutional Violations**

24         While the court has already found that all of plaintiffs' federal claims fail to state a claim

25  and are subject to dismissal under Rule 12(b)(6) for the reasons explained above, there are

26  additional pleading deficiencies with regard to several of plaintiffs' federal claims that are worth

27  noting in this order so that plaintiffs may attempt to cure these deficiencies in any third amended

28  complaint they may elect to file.

1            1.      Plaintiffs' Sixth Claim for Retaliation Is Duplicative

2            In their motion to dismiss, defendants argue that plaintiffs' sixth claim, in which plaintiffs

3    allege that defendants violated the First and Fourteenth Amendments by retaliating against him, is

4    duplicative of plaintiffs' first four causes of action (Doc. Nos. 18 at 19).  The parties then focus

5    their arguments on plaintiffs' First Amendment claims.  In their opposition to the motion,

6    plaintiffs argue that their sixth claim "is not duplicative, as it is specifically a claim for redress of

7    retaliation suffered by plaintiffs as a consequence of their exercise of rights, distinct from claims

8    for restraint from the exercise of rights."  (Doc. No. 20 at 20.)  In reply, defendants counter that

9    plaintiffs' argument is untenable because it "is based on the fiction that the First Amendment

10   claims are based on alleged restraint of speech as opposed to retaliation for speech that already

11   occurred."  (Doc. No. 24 at 8.)

12          "It is well established that a district court has broad discretion to control its own docket,

13   and that includes the power to dismiss duplicative claims."  *M.M. v. Lafayette Sch. Dist.*, 681 F.3d

14   1082, 1091 (9th Cir. 2012); *see Harmon v. Cnty. of Sacramento*, No. 2:12-cv-02758-TLN, 2016

15   WL 319232 (E.D. Cal. Jan. 27, 2016) (dismissing a claim as duplicative because it merely

16   asserted all the theories of Fourth Amendment liability that were separately articulated in other

17   claims, finding no "legal reason to maintain two causes of action with identical proof

18   requirements and identical relief available").

19          Here, the court agrees with defendants that plaintiffs' sixth claim for retaliation is

20   duplicative of their First Amendment claims.  For instance, as defendants have pointed out in

21   their reply (Doc. No. 24 at 8), plaintiffs' first claim against defendants for violating their First

22   Amendment right to free speech alleges that plaintiff Nichelini engaged in protected speech and

23   that "defendants nonetheless punished [plaintiff] Nichelini for sending the correspondence,

24   indicating that the correspondence was a substantial and motivating factor for the adverse

25   employment actions" (Doc. No. 17 at ¶ 86).  Thus, plaintiffs' first claim clearly asserts a

26   retaliation-based theory of First Amendment liability.  *See Alpha Energy Savers, Inc. v. Hansen*,

27   381 F.3d 917, 923 (9th Cir. 2004) (stating that to prevail on a First Amendment retaliation claim

28   under § 1983, a plaintiff "must establish that (1) it engaged in expressive conduct that addressed a

                                                       17

1    matter of public concern; (2) the government officials took an adverse action against it; and (3) its

2    expressive conduct was a substantial or motivating factor for the adverse action").

3         The court finds that plaintiffs' sixth claim for retaliation does not allege any violation

4    separate and apart from the violation alleged in plaintiffs' First Amendment claims.  Accordingly,

5    the court will dismiss plaintiffs' sixth claim as duplicative, without leave to amend.[9]

6              2.    Plaintiffs' Substantive Due Process Claim Is Insufficiently Pled

7         Defendants also argue that the SAC lacks sufficient factual allegations to support

8    plaintiffs' third claim, in which plaintiffs assert that defendants violated their substantive due

9    process rights under the Fourteenth Amendment.  (Doc. No. 18 at 19.)  Specifically in their third

10   claim, plaintiffs allege that defendants created certain polices that "resulted in the VPOA

11   leadership being dismantled and Nichelini being deprived of his job and livelihood and caused

12   him other injuries and damages."  (Doc. No. 20 at 19.)

13        "The right to pursue a chosen profession is protected by substantive due process . . . ."

14   *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 998 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008).

15   However, the right is "to pursue an *entire profession*, and not the right to pursue a particular job."

16   *Id.* (emphasis added).  A claim asserting that such right has been violated is limited to "extreme

17   cases, such as a 'government blacklist, which when circulated or otherwise publicized to

18   prospective employers effectively excludes the blacklisted individual from his occupation, much

19   as if the government had yanked the license of an individual in an occupation that requires

20   licensure.'"  *Id.* at 997–98 (citation omitted).  To sufficiently state such a claim, a plaintiff must

21

22   ───────────────
     [9]  Although defendants do not move to dismiss plaintiff's fifth claim, in which plaintiffs allege
     that defendants violated their Fourteenth Amendment right to equal protection, the court notes
23   that this claim also appears to be duplicative of plaintiffs' First Amendment claims.  Specifically,
     plaintiffs do not appear to assert that they were subject to any invidious classification, such as one
24   based on race or gender; rather, they contend that differential treatment towards them resulted
     from their exercise of their rights to free speech and association.  (*See* Doc. No. 17 at ¶ 129); *see*
25   *also Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 943, 944 (C.D. Cal.
     2019) (dismissing the plaintiffs' equal protection claim as duplicative of their First Amendment
26   claim where the court found that the plaintiffs could not "plead an Equal Protection claim without
     reference to their First Amendment rights").  In any third amended complaint, should plaintiffs
27   intend to include an equal protection claim, they must ground such a claim in factors other than
     the exercise of their rights to free speech and association.
28

1    allege that the "character and circumstances of a public employer's stigmatizing conduct or

2    statements are such as to have destroyed an employee's freedom to take advantage of other

3    employment opportunities." *Id.* at 998 (citation omitted). "It is not enough that the employer's

4    stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the

5    employee must [allege] that the stigmatizing actions make it virtually impossible for the

6    employee to find new employment in his chosen field." *Id.* (citation omitted).

7          Here, plaintiffs allege that plaintiff Nichelini was notified that he was dismissed from his

8    position on March 31, 2021. (Doc. No. 17 at ¶ 69.) Further, plaintiffs allege that the "March 31,

9    2021 notice of dismissal/termination outrageously and unacceptably attempts to paint [plaintiff]

10   Nichelini as a 'racist cop', an entirely unfounded and spurious allegation that effectively forever

11   destroys [plaintiff] Nichelini's career, professional reputation, and personal life . . . ." (*Id.* at

12   ¶ 70.) However, plaintiffs have offered only conclusory allegations that plaintiff Nichelini was

13   painted as a "racist cop" with career-ending consequences. They have not alleged, for instance,

14   that plaintiff Nichelini was denied employment opportunities outside of the VPD. *See Rogers v.*

15   *Oregon*, No. 6:14-cv-00005, 2014 WL 3513369, at *3 (D. Or. July 14, 2014) (granting the

16   defendants' motion to dismiss where the plaintiff had not alleged that she was prevented from

17   continuing her profession with another employer); *Wilson v. Maricopa Cnty. Cmty. Coll. Dist.*

18   *Governing Bd.*, No. 19-cv-00068-TUC-SHR, 2020 WL 10320897, at *3 (D. Ariz. Aug. 24, 2020)

19   (dismissing the plaintiff's substantive due process claim where the plaintiff "provide[d] only

20   conclusory statements that he was 'branded unemployable' and 'suffered damages' due to

21   Defendants' 'intentional actions'" and failed to "cite any factual content to support his

22   allegations, such as being denied employment outside of MCCCD"). Nor have they alleged that

23   the March 31, 2021 notice was disseminated or made public to prospective employers. *See*

24   *Engquist*, 478 F.3d at 997; *see also Wilson*, 2020 WL 10320897, at *3 (holding that the plaintiff

25   did not state a cognizable substantive due process claim where the plaintiff did not allege that

26   "the EEO Report was 'circulated or otherwise publicized to prospective employers'") (citation

27   omitted). For these reasons, plaintiffs' current allegations fall short of stating a cognizable

28   substantive due process claim.

As part of their substantive due process claim, plaintiffs also allege that "[all defendants'], and each of them, arbitrary enforcement of VPD policies, guidelines, and standards significantly burdens VPOA members' speech, associational, and employment rights, and have entirely deprived the VPOA of much needed fierce, knowledgeable, and experienced representation in a hyper-political environment by terminating [plaintiff] Nichelini pretextually."  (Doc. No. 17 at ¶ 110.)  These allegations do not save plaintiffs' substantive due process claim, however, because the Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citation and internal quotation marks omitted).  Given that the First Amendment explicitly safeguards the rights to free speech and association, plaintiffs cannot ground a substantiative due process claim on a violation of these First Amendment rights.  *See Lalack v. Oregon*, No. 3:11-cv-01285-BR, 2013 WL 819789, at *12 (D. Or. Mar. 5, 2013) ("Because the First Amendment provides explicit protection for the right to free speech, Plaintiff may not base a substantive due-process claim on a violation of her right to free speech."); *Spears v. Ariz. Bd. of Regents*, 409 F. Supp. 3d 779, 788 (D. Ariz. 2019) ("As the First Amendment provides for free speech protection, [the plaintiff] may not additionally base a due process claim on a violation of his right to free speech.").

Because plaintiffs have failed to allege sufficient facts to support a cognizable substantive due process legal theory under the Fourteenth Amendment, this failure is an additional basis upon which the court will grant defendants' motion to dismiss plaintiffs' third claim, with leave to amend.

3. Plaintiffs' Procedural Due Process Claim Is Insufficiently Pled

Defendants also contend that the SAC lacks sufficient factual allegations to support plaintiffs' fourth claim, in which plaintiffs assert that defendants violated their Fourteenth Amendment right to procedural due process.  (Doc. No. 18 at 19.)

Procedural due process claims have two elements:  (1) a deprivation of a protected liberty or property interest, and (2) a "denial of adequate procedural protections."  *Brewster v. Bd. of*

1  *Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).  Procedural due process

2  is owed when there is a deprivation of property as defined by state law.  *Bd. of Regents of State*

3  *Colleges v. Roth*, 408 U.S. 564, 577 (1972).  "Precisely what procedures the Due Process Clause

4  requires in any given case is a function of context . . . due process is not a technical conception

5  with a fixed content unrelated to time, place and circumstances . . . [r]ather, it is flexible and calls

6  for such procedural protections as the particular situation demands."  *Brewster*, 149 F.3d at 983

7  (internal quotation marks and citations omitted).  Generally, determining which procedures satisfy

8  due process in a given situation involves the balancing of the private interest affected by the

9  official action, the risk of erroneous deprivation of the interests and the value of alternative

10  procedures, and the government entity's interest.  *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319,

11  335 (1976)).

12         In their opposition to the pending motion, plaintiffs contend that they have sufficiently

13  alleged that all defendants "violated the plaintiffs' due process rights by creating and

14  implementing policies specifically and solely for the purpose of depriving plaintiffs of their

15  constitutional rights."  (Doc. No. 20 at 18.)  Plaintiffs point to their allegation that defendants:

16  
17              participated in the formation of official polices, and promulgated,
              adopted, and ratified plans with an aim to 'reform' the VPD,
              including by altering, changing, and removing, or attempting to
18              alter, change, or remove, procedural requirements, including
              requirements of, the California Penal Code, the California Evidence
              Code, the State Constitution and Federal Constitution, the MMBA,
19              the Police Officer's Bill of Rights, and the Ralph C. Dills Act, and
              qualified immunity, among others, that were in place to protect the
20              rights of VPOA members, including [plaintiff] Nichelini.

21   (*Id.* at 19) (citing Doc. No. 17 at ¶ 117).

22         With regard to these allegations, the court finds that plaintiffs have failed to articulate a

23  plausible procedural due process claim.  After reviewing the SAC and the parties' briefings, it

24  remains unclear to the court what plaintiffs' "property interest" is in these laws which they cite.

25  Moreover, the court notes that plaintiffs have not alleged that any "deprivation" in this regard

26  occurred without due process being afforded to them.

27         In addition, in their SAC, plaintiffs allege that "defendants, and each of them, denied

28  [plaintiff] Nichelini the opportunity to be heard and to have a neutral decision maker decide any

adverse employment consequences." (Doc. No. 17 at ¶ 118.) Regarding the first element of a procedural due process claim, defendants do not contest that plaintiff Nichelini has a property interest in his ongoing employment as an officer at the VPD.

Moving to the second element, however, the question arises as to whether plaintiffs have alleged that plaintiff Nichelini was denied adequate procedural protections in connection with the alleged adverse employment actions. Before taking punitive action against a permanent civil service employee, "due process does not require the state to provide the employee with a full trial-type evidentiary hearing . . . ." *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194, 215 (1975). However, due process does require that the employee receive, at a minimum, "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." *Id.* That is, before termination, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). "[T]he pretermination 'hearing,' though necessary, need not be elaborate," and "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* at 545 (citation omitted). At a pre-termination hearing, a plaintiff is only entitled to notice and an opportunity to respond. *Id.* at 546. These procedures serve to "minimize the risk of error in the initial removal decision," *Skelly*, 15 Cal. 3d at 215, and "are merely anticipatory of the full rights which are accorded to the employee after discharge," *Kirkpatrick v. Civ. Serv. Com.*, 77 Cal. App. 3d 940, 945 (1978).

The court has identified three adverse employment actions alleged by plaintiffs in the SAC: (i) plaintiff Nichelini's termination from the VPD in March 2021; (ii) the notice of unpaid suspension issued to plaintiff Nichelini in March 2021; and (iii) plaintiff Nichelini's suspension in July 2020. The court will analyze the allegations regarding each of these incidents to ascertain whether they state a viable procedural due process claim.

/////

/////

1                           a.    *March 2021 Termination*

2              Here, plaintiffs have not sufficiently alleged a procedural due process claim based on

3    plaintiff Nichelini's termination from the VPD in March 2021 because plaintiffs do not allege that

4    defendants failed to afford plaintiff Nichelini notice or an opportunity to respond.  To the

5    contrary, plaintiffs allege that prior to learning on March 31, 2021 that he had been terminated

6    from his position at the VPD, plaintiff Nichelini was notified on December 15, 2020 that he was

7    the subject of an internal affairs investigation regarding VPOA correspondence with a member of

8    the news media, was subsequently interrogated about the incident on December 18, 2020, and

9    received notice on December 21, 2020 that the City intended to terminate him.

10             Although the SAC alleges that plaintiff Nichelini was denied the opportunity "to have a

11   neutral decision maker decide any adverse employment consequences," (Doc. No 17 at ¶ 118),

12   the absence of a neutral decisionmaker at a pre-terminating hearing does not create liability

13   provided there is a neutral decisionmaker during a subsequent post-termination hearing.  *See*

14   *Walker v. City of Berkeley*, 951 F.2d 182, 183 (9th Cir. 1991) (holding that "the failure to provide

15   an impartial decisionmaker at the pretermination stage, of itself, does not create liability, so long

16   as the decisionmaker at the post-termination hearing is impartial").  Here, plaintiffs' allegations

17   do not clarify whether plaintiff Nichelini had a post-termination hearing or whether a neutral

18   decisionmaker was involved in such a hearing.  As such, the SAC has not alleged sufficient facts

19   to state a viable procedural due process claim based on plaintiff Nichelini's March 2021

20   termination.

21                          b.    *March 2021 Unpaid Suspension*

22             Plaintiffs also allege that on March 31, 2021, defendants, through defendant Williams,

23   delivered a notice of 40 hours of unpaid suspension to plaintiff Nichelini for the September 24,

24   2019 city council meeting incident.  However, plaintiff Nichelini does not allege that he was

25   denied notice or an opportunity to be heard before he received this notice of unpaid suspension.

26   To the contrary, he alleges that on August 28, 2020, he received a notice of an interview

27   regarding that city council meeting incident, and that on September 23, 2020, he received a notice

28   of intent to discipline him for the city council meeting.  Given these notices, it is unclear what

                                                  23

1   procedures, if any, plaintiff Nichelini alleges were inadequate with respect to this adverse

2   employment action.  The SAC, for example, does not allege that plaintiff Nichelini was not

3   interviewed in connection with this suspension.  As a result, the SAC fails to state a cognizable

4   procedural due process claim based on the March 2021 unpaid suspension of plaintiff Nichelini.

5               c.      *July 2020 Suspension*

6        Similarly, plaintiffs allege that "defendants, and each of them, further denied [plaintiff]

7   Nichelini the opportunity to be noticed, to be heard, and to have a decision on any adverse

8   employment consequences be made by a neutral decision maker by falsely accusing [plaintiff]

9   Nichelini of destroying windshield evidence and placing him on administrative leave despite [all]

10  defendants' and each of them, knowledge that [plaintiff] Nichelini was not involved in the

11  destruction of windshield evidence."  (Doc. No. 17 at ¶ 119.)  However, the SAC does not specify

12  whether the July 2020 administrative leave was unpaid.  As such, the SAC lacks sufficient

13  allegations to state a claim for a violation of procedural due process based on plaintiff Nichelini's

14  July 2020 suspension.  *See Espinoza v. City of Tracy*, No. 15-cv-00751-WBS-KJN, 2018 WL

15  2318335, at *5 (E.D. Cal. May 22, 2018) ("[A] public employee suspended with pay has not been

16  deprived of a property interest.").

17       For these reasons, the SAC lacks allegations supporting a cognizable procedural due

18  process claim.  Accordingly, this failure is an additional basis upon which the court will grant

19  defendants' motion to dismiss plaintiffs' fourth claim, with leave to amend.

20          4.      Plaintiff Nichelini's Federal Privacy Claim Is Not Cognizable

21       Plaintiff Nichelini alone asserts the seventh claim, in which he alleges that defendants

22  violated his federal constitutional right to privacy by releasing "confidential personnel

23  information, including disciplinary action taken against [plaintiff] Nichelini, to members of the

24  public and the media."  (*Id.* at ¶ 171.)  In their opposition to the pending motion, plaintiffs clarify

25  that they assert this claim "under a fundamental constitutional right falling under the 'undefined

26  penumbra' of constitutional protections, and the Fourteenth Amendment."  (Doc. No. 20 at 19)

27  (citing *Whalen v. Roe*, 429 U.S. 589, 600 n.23 (1977)).

28  /////

1       While the constitutional right to privacy includes the "individual interest in avoiding

2   disclosure of personal matters," *id.* at 599, "courts have construed this right narrowly, limiting it

3   to those rights which are 'fundamental or implicit in the concept of ordered liberty.'"  *Carver v.*

4   *Rathlesberger*, No. 04-cv-01918-DFL-PAN, 2005 WL 3080856, at *2 (E.D. Cal. Nov. 11, 2005)

5   (quoting *St. Michael's Convalescent Hosp. v. Cal.*, 643 F.2d 1369, 1375 (9th Cir. 1981)).  "To

6   merit constitutional protection, the information disclosed must be of such a 'highly personal or

7   sensitive nature that it falls within the zone of confidentiality.'"  *Olivera v. Vizzusi*, 2011 WL

8   1253887, at *2 (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1570–71 (10th Cir. 1989)).

9   Individuals do not possess a constitutional right to informational privacy in the disclosure of a

10  police department reprimand and the underlying reasons for said reprimand.  *See Flanagan*, 890

11  F.2d at 1570–71 (holding that a police chief's disclosure to media of reprimands he issued against

12  police officers did not violate officers' right to privacy, stating that the fact that reprimands were

13  issued was not information as to which officers had a legitimate expectation of confidentiality).

14      Plaintiff Nichelini argues that "California Evidence Code Section 1043 mandates that no

15  employment records of a peace officer are to be produced or otherwise obtained without a court

16  order, creating a reasonable expectation of privacy" in his "personnel information."  (Doc. No. 20

17  at 19.)  However, "[t]he violation of state privacy laws, even if proved, would not establish

18  liability under § 1983."  *Thompson v. Scully*, No. 2:13-cv-01539-LKK-AC, 2014 WL 1400858, at

19  *5 (E.D. Cal. Apr. 10, 2014), *report and recommendation adopted*, No. 2:13-cv-01539-KJM-AC,

20  2014 WL 5503381 (E.D. Cal. Oct. 2, 2014), *aff'd sub nom. Thompson v. Davis*, 623 F. App'x 895

21  (9th Cir. 2015).

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

1    Accordingly, the court will grant defendants' motion to dismiss plaintiff Nichelini's

2    seventh claim for his constitutional right to privacy without leave to amend.[10]

3    **D.      Plaintiffs' State Law Claims**

4    "Where all federal claims are dismissed in an action containing both federal and state law

5    claims, a federal court may decline to exercise supplemental jurisdiction over the remaining state

6    law claims." *Tennyson v. Cnty. of Sacramento*, No. 2:19-cv-00429-KJM-EFB, 2020 WL

7    4059568, at *7 (E.D. Cal. July 20, 2020). Because the court dismisses plaintiffs' federal claims,

8    the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.

9    Accordingly, plaintiffs' state law claims are dismissed without prejudice to renewal in any

10   third amended complaint they may elect to file which asserts cognizable federal claims.

11                                        **CONCLUSION**

12   For the reasons explained above,

13   1.      Defendants' motion to dismiss (Doc. No. 18) is granted with leave to amend, in

14           part, as follows:

15           a.      Plaintiffs' sixth claim of retaliation is dismissed without leave to amend;

16           b.      Plaintiff Nichelini's seventh claim for a violation of his federal

17                   constitutional right to privacy is dismissed without leave to amend;

18           c.      Plaintiffs' claims against the individual defendants in their official capacity

19                   are dismissed without leave to amend; and

20           d.      Plaintiffs' remaining claims are dismissed with leave to amend;

---

10 Defendants also challenge whether the plaintiffs have sufficiently alleged plaintiff VPOA's
associational standing. (Doc. No. 18 at 14.) Since the court has already concluded that the
plaintiffs have not adequately stated their federal claims and will dismiss those claims with leave
to amend, the court will not address the defendants' associational standing arguments in this
order. Defendants are free to raise associational standing arguments should they move to dismiss
the anticipated third amended complaint. Additionally, the court notes that the SAC does not
clearly distinguish the relief sought by each plaintiff and each claim. Therefore, plaintiffs should
clearly outline this information in any third amended complaint they elect to file. This is
particularly important because, in cases where an organizational plaintiff seeks both monetary and
injunctive relief based on associational standing, courts have allowed claims based on injunctive
relief to proceed without requiring the participation of individual members but have dismissed
claims based on monetary damages. *See Laborers Int'l Union Loc. 261 v. City & Cnty. of S.F.*,
No. 22-cv-02215-LB, 2022 WL 2528602, at *6 (N.D. Cal. July 6, 2022); *Comm. for Immigrant
Rts. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1194 (N.D. Cal. 2009).

2.      Any third amended complaint that plaintiffs may elect to file in this action shall be filed within twenty-one (21) days after the date of entry of this order;

3.      If plaintiffs elect not to file a third amended complaint, then they shall file a notice of their intent not to file a third amended complaint by no later than twenty-one (21) days after the date of entry of this order; and

4.      The court cautions defendants that should they wish to file a motion to dismiss in response to the third amended complaint, they must meaningfully comply with the court's Standing Order (Doc. No. 30), including the meet and confer requirements outlined therein.

IT IS SO ORDERED.

Dated:   **September 28, 2023**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

27